## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **(1)** | **CRYSTAL MARIE DANIELS,** | ) |
| | | ) |
| | **Plaintiff,** | ) |
| **v.** | | ) |
| | | ) |
| **(1)** | **THE BOARD OF REGENTS OF THE** | ) |
| | **UNIVERSITY OF OKLAHOMA;** | ) |
| | | ) **No. CIV-22-625-R** |
| **(2)** | **UNIVERSITY HOSPITALS AUTHORITY,** | ) |
| | **an agency of the State of Oklahoma, and RANDY** | ) |
| | **DOWELL, in his official capacity as the Chief** | ) |
| | **Executive Officer of University Hospitals Authority;** | ) |
| | | ) |
| **(3)** | **DARRYL J. TILLER, (in his individual and official** | ) |
| | **capacities) Director of Clinical Pastoral Education,** | ) |
| | **University of Oklahoma Medical Center; and** | ) |
| | | ) |
| **(4)** | **OU MEDICINE, INC., an Oklahoma domestic** | ) |
| | **not-for-profit corporation, d/b/a OU Health,** | ) |
| | | ) |
| | **Defendants.** | ) |

## FIRST AMENDED COMPLAINT

COMES NOW, the Plaintiff, Crystal Marie Daniels ("Plaintiff") by and through

counsel of record, Kwame T. Mumina and Cynthia Rowe D'Antonio, of Green Johnson

Mumina and D'Antionio, and files her First Amended Complaint and Claims For Relief

pursuant to the Court's Order of October 28, 2022 [Dkt. No. 23] against Defendants, The

Board Of Regents of University of Oklahoma ( hereinafter referred to as "The University

of Oklahoma"), University Hospitals Authority ("UHA") and OU Medicine, Inc. d/b/a OU

Health (OUMI) for violations of Title IX of the Education Amendments of 1972, 20 U.S.C.

§ 1681 (Title IX); Plaintiff also brings this action under 42 U.S.C. § 1983 ("1983") against Defendants The University of Oklahoma, UHA, OUMI and  Darryl J. Tiller ("Tiller") in his individual capacity, for violations of Plaintiff's right to equal protection, as applicable to Plaintiff, based on the grounds of sex and race.  Plaintiff asserts claims of status-based sex and race discrimination, and retaliation pursuant to 42 U.S.C. § 1981 against the University of Oklahoma, UHA and OUMI, and pursuant to Title VI of the Civil Rights Act of 1964,  42 U.S.C. § 2000(d), *et seq.*, and additionally Plaintiff alleges violation of her civil rights based on racial discrimination and a racially hostile and discriminatory environment at the University of Oklahoma, UHA and OUMI; Plaintiff asserts status-based race, sex and gender based discrimination, harassment and retaliation and wrongful discharge against The University of Oklahoma and OUMI, pursuant to Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000(e), *et seq.*); and Plaintiff asserts ancillary state law claims of intentional infliction of emotional distress and negligence based on actions of Defendant Tiller.

Among other factors, what makes this case so abhorrent and offensive, is that these claims occurred not only within an educational setting; but under the umbrella of religious faith, compassion and trust given to professionals who were endowed with a near sacred obligation and expectation to conduct their affairs in the highest honor. That solemn commitment and expectation of trust and fair play exposed Plaintiff to vulnerabilities which Defendants exploited in total disregard of their own ethics and the law.  Indeed, Defendants allowed and even enabled its employee, Dr. Darryl J. Tiller, to violate and to continue to violate those ethics and the laws despite having years of prior knowledge of his

unlawful conduct and behavior, to include racial animus, sexual and gender harassment, explosive personal behavior, and tendencies to create a hostile environment for students and staff.

The severe, pervasive and objectively offensive racial discrimination, and sexual harassment to which the Plaintiff was subjected, coupled with the Defendants deliberate indifference and clearly unreasonable response to sexual and racial misconduct, caused the Plaintiff to lose educational benefits and opportunities and to suffer emotional and other damages. Defendants' actions and deliberate indifference have caused lifelong injuries and damages that Plaintiff has suffered and continues to suffer. Defendants were deliberately indifferent to Dr. Tiller's past misconduct; were deliberately indifferent to complaints from Plaintiff and staff and employees regarding past and current misconduct of Dr. Tiller, thus fostering a safe space for racial animus, sexual misconduct, and gender bias; all the while allowing and empowering Dr. Tiller to confidently abuse his authority.

## **PARTIES**

1.      Plaintiff, Crystal Marie Daniels (sometimes referred to as "Crystal") is an African-American female, and at all material times was a resident of the State of Oklahoma and Oklahoma County. Crystal is a member of a protected class for purposes of her claims asserted herein. Additionally, at all times material hereto, Crystal invited to participate in a summer internship with the Chaplaincy Program affiliated with the University of Oklahoma.  She later was accepted into a Residence Chaplain Program affiliated with The University of Oklahoma and was enrolled as a graduate student.

2.     The University of Oklahoma, is a comprehensive university operating under the jurisdiction of The Board of Regents of the University of Oklahoma (the Board of Regents).  At all relevant times The University of Oklahoma operated within the State of Oklahoma and the Western District of the State of Oklahoma.  For all material times to the claims alleged, through the Board of Regents, The University of Oklahoma had contractual relationships and affiliations with Defendants UHA and OUMI, and The University of Oklahoma served as the academic partner of OUMI.

3.     Defendant The University of Oklahoma receives federal funding and financial assistance within the meaning of 20 U.S.C. § 1681(a) and is otherwise subject to Title IX.

4.     Defendant University Hospitals Authority is an agency of the State Of Oklahoma, with powers of government and with supervisory authority to exercise the rights, privileges and functions as specified in the University Hospitals Authority Act, 63 O.S. § 3201 *et. seq.*  Those powers include, but are not limited to, entering into cooperative agreements with the Board of Regents of the University of Oklahoma for educational programs, professional staffing, research and other medical activities. Randy Dowell serves as the Chief Executive Officer of the University Hospitals Authority, and is responsible for carrying out the policies of UHA.

5.     Defendant Tiller, is a White male, and for all material times was a resident of Oklahoma County.  At all material times regarding the claims herein, Defendant Darryl J. Tiller, D. Min., was associated with the Clinical Pastoral Education Pastoral Care Service at The University of Oklahoma and  with OUMI.

4

6.      On information and belief, Defendant Tiller has been a professor at the University of Oklahoma for over fifteen (15) years.

7.      At all relevant times, Defendant Tiller was an employee of a publicly-funded educational institution and was acting both officially and individually, as he exploited his governmental authority and power, violated and deprived Plaintiff of her constitutional rights.

8.      Defendant OU Medicine, Inc., is an Oklahoma not-for-profit corporation and does business as OU Health, and is affiliated of Defendant, the University of Oklahoma, and does business in Oklahoma County.  OU Medicine, Inc., employs the requisite number of employees and is considered an "employer" for purposes of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000(e), *et seq*.).  Defendant OU Medicine, Inc., may be served through its registered agent, CT Corporation System, 1833 South Morgan Road, Oklahoma City, Oklahoma, 73128.

## JURISDICTION AND VENUE

9.      This case arises under several laws of the United States, specifically Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 *et. seq.;*42 U.S.C. § 1981; 42 U.S.C. § 1983, and Title  VI and VII of the Civil Rights Act of 1964  (42. U.S.C. § 2000(d), *et seq*.) and (42 U.S.C. § 2000(e), *et seq*.).

10.      For purposes of Plaintiff's Title VII claims, The University of Oklahoma and OU Medicine, Inc., are an "employer" as that term is defined by 42 U.S.C. § 2000e(b); likewise, Crystal  was an "employee" as that term is defined by 42 U.S.C. § 2000e(f).

11.     This Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1331, 1332, and 1343; and supplemental jurisdiction of state law claims pursuant to 28 U.S.C. § 1367(b).

12.     This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. § 1391. The Defendants are residents of the State in which this district is located and all or a substantial part of the events or omissions giving rise to the claims being asserted occurred in the Western District of Oklahoma.

## ALLEGATIONS AND FACTS

13.     Plaintiff, Crystal Marie Daniels, is an African American female.

14.     Crystal began as a summer intern in a program at The University of Oklahoma as a part of its Chaplaincy Program during the late summer of 2020.  The Chaplaincy internship program is a steppingstone into the regular Chaplain Residency Program at The University of Oklahoma, commonly referred to as Clinical Pastoral Education or "CPE".

15.     Plaintiff's major objective was to successfully complete the summer internship and be selected as a Resident Chaplain, as part of her educational and career goal of becoming a Chaplain, through the University of Oklahoma's graduate education program.

16.     During the latter part of her summer internship, Crystal returned from a visit with her family and friend in Texas.  One afternoon, while in a one-on-one evaluation session with her Educator, Defendant Dr. Darryl J. Tiller began asking Plaintiff unusually personal questions of a sexual nature.

17.     For example, Dr. Tiller asked if she had "gotten her needs met" while away for her visit in Texas.  Initially startled at the inquiry, Plaintiff was unsure how to respond and was baffled.  She paused so as to wait for some sort of explanation from Dr. Tiller, who continued to stare at her in a suggestive manner.

18.     After a few seconds, Dr. Tiller smiled excitedly at Crystal and made unwanted sexual advances towards her that included extending his hands towards her to invite contact, and moved his lips as if blowing several kisses at her.  While standing, Dr. Tiller then started moving his middle lower abdominal area in a circular motion as if demonstrating sexual intercourse.

19.     Crystal was stunned and befuddled at Dr. Tiller's conduct and behavior, but didn't want to offend him for fear of damaging her educational and career goals. Although she was signaling her discomfort, she found a way to politely decline Dr. Tiller's unwanted and uninvited sexual advancements.  Dr. Tiller appeared to ignore her discomfort and continued to smile curiously.  Crystal just reluctantly smiled back as Dr. Tiller appeared to be analyzing the situation,  and eventually Crystal exited the room.

20.     In the one-on-one weekly sessions that followed, Dr. Tiller continued his sexual advances by hugging Crystal in an obviously sexual fashion, tightly caressing her such that her breast pushed against his chest, and on at least one occasion she could sense that Dr. Tiller had an erection as he hugged her.

21.     The one-on-one sessions with Defendant Tiller frequently included questions about Plaintiff's personal and sexual life, whether she was involved with anyone, and

whether she had met anyone she was attracted to.  Dr. Tiller often commented about her appearance and insisted that she share very personal stories with him.

22.     Crystal was uncomfortable with Dr. Tiller's behavior and conduct and did not consent to the repeated physical contact, nor did she attempt to reciprocate the sexual advances.

23.     Crystal subjectively believed that unless she expressed something in the nature of an air of indifference in her response to advances by Dr. Tiller, that her grades, education and future career could be negatively impacted.

24.     Under the totality of the circumstances, Crystal's belief that her response could impact her grades, career and success in the program was objectively reasonable.

25.     As her current professor and educator, as well as being Director of the Clinical Pastoral Education, Pastoral Care Services, Defendant Tiller had a position of power over Crystal such that any sexual impositions by Defendant Tiller involved an inherent *quid pro quo*.

26.     Following her internship, Crystal was accepted as a Pastoral Care Resident and Chaplain in the ACPE Program affiliated with the University of Oklahoma. Defendant Tiller was serving as the Director of Clinical Pastoral Education and would be Crystal's immediate supervisor and educator,  and would require frequent personal and group contact with Crystal as she advanced through the program.  They would share offices that were within only a few feet of each other.

27.     The ACPE program consisted of two parts, including the Clinical and CPE educational course work.  The Clinical part entailed Crystal working with actual patients

in a hospital setting consisting of 300 hours per Unit. The CPE component is the academic or educational part and consists of 100 hours per Unit, for a total of 400 hours per Unit. Crystal was required to complete Four Units for her Residency Program for a total of 1600 hours.

28.     Crystal's Clinical work included being a paid employee at OUMI, where she often worked twelve-hour shifts. The Clinical work was profound and stressful, as her pastoral services were routinely with patients and families of the Trauma Emergency Department at the OU Medical Center. Her intervention was often with families during tragic moments where they were coping with horrific injuries.

29.     During her Residency, Crystal would have an interchangeable move from Clinical to Education that involved Monday one-on-one sessions with Defendant Tiller, and then eventually twice a week meeting with him. She was also required to participate in group class sessions with other students. During the individual sessions with Defendant Tiller, Crystal continued to receive the sexual harassment and sexual overtures that she'd experienced during her internship. Crystal continued to rebuff Defendant Tiller's advances and insisted that the sessions focus on her studies and academic performance. She would politely and professionally attempt to neutralize the atmosphere during those sessions as best she could. Her non-acceptance of Defendant Tiller's advances began to trigger an adverse reaction from him.

30.     On or about January 11, 2021, as part of her academic requirement, Plaintiff presented a verbatim that focused on the importance of showing empathy, compassion and patience towards patients, but was targeted towards single mothers. During her presentation,

Dr. Tiller became irate and began verbally attacking Crystal, yelling that her verbatim did not have a "learning goal", and stating to Plaintiff "you have been in this CPE training much longer than your peers and you should know what a learning goal is by now."   As Crystal tried to explain and get a word in, Dr. Tiller's attack became even more insulting, and his rant became louder, commenting "Crystal, do you even know what your learning goals are…Do you even know what the word goal means…Do you know what the word intent and effect means…Do you know the definition of intent…Do you know what the definition of effect means?"

31.     At that point Defendant Tiller left the classroom and went to his office to retrieve Crystal's entire student file. He returned and  began to read out loud his personal notes to the class with the intent of intentionally belittling Crystal.  He then closed her file and slammed it to the floor in the direction of the trash can, and continued to make shameful comments about Crystal and her incompetency.

32.     Later that evening, around 7:00 p.m., Crystal met with Defendant Tiller for their one-on-one session in his office.  Still in shock  and humiliated over what had occurred in class earlier that day, Crystal was in tears and could barely speak.  Defendant Tiller offered that he didn't realize he'd done anything wrong and didn't realize how sensitive she was.

33.     In Crystal's subsequent verbatim presentations, Defendant Tiller continued his pattern of demeaning behavior towards Crystal.  When she questioned his attacks on her, Defendant Tiller would make a point of laughing at her, and made it clear to her and the class that he was offended by Crystal "confronting him" and "calling him out" for his

behavior towards her.

34.     During the verbatim sessions, other female peers of Crystal, such as Tonya Forman, made comments about Defendant Tiller's disparate treatment of Crystal in particular and women in general.

35.     Crystal was the only African American in Defendant Tiller's class.  Although Defendant Tiller was brutal and cruel towards Crystal, for alleged deficiencies in her classwork, he failed to point out the same or similar alleged deficiencies of other students' work.

36.     In one of the individual sessions between Crystal and Defendant Tiller, he commented about her completing her Divinity degree.  Defendant Tiller then proceeded to mention a former African American student of his that was pursuing a Doctor of Divinity degree at another school. Commenting to Crystal about the African American student, Dr. Tiller emphasized that that student didn't have the caliber, quality or character to carry the title of having a Doctorate degree because he considered her "trash from the streets."  Then he took a book that he had previously assigned for the class to read, and made direct comments at Crystal to the effect that she "obviously had trouble  pronouncing words" and that she frequently "mispronounced words in class."  Defendant Tiller then continued to badger Crystal, asking "do you have a problem with reading"….. "do you not see spelling of words" … "your teachers have told you that you couldn't learn, right…." and "have you ever been diagnosed with dyslexia?"

37.     During an individual session with Crystal around the first of February, 2021, Defendant Tiller  asked her "why would you want to carry or have a doctorates degree title

because when you open your mouth to read or speak you are going to embarrass yourself and people will know that you can't read….Do you really want to make yourself look like a fool in front of people?"

38.    In another individual session with Defendant Tiller, during the same time period, he attempted to convince Crystal that the indignation she was experiencing from his previous conduct and behavior, was nothing more than her transferring her "childhood shame" onto him; and that accusing him of wrongdoings was therefore misplaced emotions.

39.    In late early February, 2021, Plaintiff was approached by Kent Kelso, Staff Chaplain at University of Oklahoma, who recognized that she was visibly emotional, and apparently shaken by the sum of events she'd been experiencing with Defendant Tiller. He inquired of Plaintiff as to what was going on and Plaintiff briefly relayed some of the events described above.

40.    After a short discussion, Kent Kelso advised Plaintiff that she should immediately talk with Danny Cavett, Director of Pastoral Care ("Cavett") or Bob Thompson, one of her supervisors.

41.    Plaintiff arranged to talk with Mr. Cavett about the events and learned from Mr. Cavett that apparently the University of Oklahoma had years of previous complaints about Defendant Tiller, and that his behavioral issues were well known.  Despite confessing that he not only had knowledge of Defendant Tiller's past conduct, and never questioned the events Plaintiff had detailed to him, Cavett was unmoved. At the conclusion of Plaintiff's meeting with Cavett, his question was suggestive:  "Crystal, do you want to complete this Program?  If you do, then just go back to class and deal with it."  In light of

all that Cavett knew about Defendant Tiller, Plaintiff found it difficult to accept his recommendation and shared his response with Kent Kelso, who apparently had discussed the matter with Bob Thompson.  Kent Kelso advised he'd again approach Cavett, recommending that Cavett follow proper protocol; and if he failed to do so, Mr. Kelso threatened to intervene.

42.    In early February, 2021, Cavett approached Plaintiff and suggested that she contact Isaac Stine in the Human Resources Department.  Cavett went on to reiterate events of how Defendant Tiller had been known to have acted inappropriately on numerous occasions before. He recited that Defendant Tiller's conduct had been directed towards both students and staff at The University of Oklahoma.

43.    By early February, 2021, Crystal was close to completing her Third of the Four Residency Units needed to graduate.  She had already shared with Cavett her concerns that if she filed a complaint against Defendant Tiller, he'd find a way to dismiss her from the program.  However, Cavett reassured her that a dismissal wasn't going to happen and that, in any event, she'd been doing  an excellent job and had nothing to fear.

44.    On February 4, 2021, Plaintiff reluctantly filed her formal grievance against Defendant Tiller, but was embarrassed and ashamed to outline the entire scope and breath of events on paper as they had unfolded from the time of her internship. A copy of Plaintiff's Complaint is attached hereto and incorporated as Plt. Exb. No. 1.

45.    The last group session Plaintiff had with Defendant Tiller proved to be most alarming and exposed the racial animas embedded in Defendant Tiller. In that group class session, as he'd previously done in one-on-ones with Plaintiff, Defendant Tiller expressed

his disdain for Blacks and other non-White people.  He openly admitted that he believed "Blacks were inferior to Whites" and justified his reasons by pointing out examples of "Blacks not owing anything, homes, cars" and other important things of value.

46.    In several of the previous individual sessions with Crystal, he often made statements directed to her about Blacks being uneducated and that she should expect abnormal reactions from Blacks in medical crises or death situations.  Defendant Tiller made a point of inquiring about Plaintiff's family ethnicity and frequently  asked Plaintiff (and other group peers) if their patient's families were Black and if so, whether they appeared to be educated.

47.    In another group setting, and again in an individual setting, Defendant Tiller stated words to the effect that "the only people I grew up with and lived around were Whites".  He added that over time he began to accept some Hispanics "because they looked more like Whites."  He went on to explain that Hispanics were "welcome in his world, not blacks" and that "Blacks were never welcome or accepted in his world."

48.    On or about February 15, 2021, Plaintiff had a one-on-one session with Defendant Tiller at his office, and he immediately brought up the Complaint that she'd filed against him.  Crystal was nervous about this particular session and requested that Dr. Tiller keep his door open as she recognized another Chaplain on duty at a nearby office. She refused to answer any question Defendant Tiller raised about the Complaint.  During the session, Defendant Tiller began reading Plaintiff's weekly progress notes that referenced the relationship between the student and Educator (Defendant Tiller).

14

49.     In her progress notes, Plaintiff had made reference to her relationship with Defendant Tiller, noting that she was "learning to stand up for herself when I do not agree with how I am being treated."  Defendant Tiller was reading that portion of the notes out loud, questioned why Crystal would write something like that in her notes, and wanted to know what he had done to make her say "something like that."  When Crystal made an attempt to explain, Defendant Tiller became defiant, stating [to Crystal] "You are incompetent….  you can barely read or understand this CPE program… I'm a professional and I'm telling you that you are incompetent."

50.     When Crystal attempted to defend herself and object to Defendant Tiller's behavior and personal attacks, Defendant Tiller said that he would not meet with her again. He told Plaintiff that she was not welcomed back in class or Individual Supervision Sessions, both of which were necessary for her to complete the CPE program.

51.     During this same period, the internal investigation of Plaintiff's complaint about Defendant Tiller was on-going.  From time-to-time, Cavett would caution Plaintiff to not discuss what had occurred with Defendant Tiller with anyone else as he didn't want other hospital staff to know about those events.

52.     As Plaintiff was barred from Class by Defendant Tiller, and it was approaching time for final exams to complete the Unit, she began searching for alternative educators of the interim CPE pool. On top of being stressed from continuing to work her twelve-hour clinical shift, she was desperate to find a way to complete her classwork.

53.     In mid to late February, 2021, Plaintiff spoke with Cavett who stated that he had some discussions with Defendant Tiller about her returning to class to complete her

Unit. However, Defendant Tiller reaffirmed his decision to ban Crystal from class, terminated her individual sessions, and refused to allow her to complete her Unit of CPE or to enter her next and final CPE Unit. A copy of Defendant Tiller's email directives are attached here to as Plaintiff's Exb. No. 2.

54.    However, in an apparent effort to coerce Crystal into modifying her complaint against him, in exchange for being readmitted to class and completing her Third CPE, Defendant Tiller sent suggestive emails to her implying that he had never done anything wrong towards her and that he was her "first hero/champion." That effort by Defendant Tiller only contributed to Plaintiff's stress and anxiety, causing her to request that Human Resources direct Defendant Tiller to not communicate with her directly and only go through Human Resources.

55.    Plaintiff knew that Defendant Tiller may have the responsibility of grading and doing an evaluation of her work, even if she were to return to class; and she questioned his ability to be fair and impartial. All of the events had culminated in Crystal feeling intimated, anxious, agitated, vulnerable and depressed, causing episodes of excessive crying and restlessness for long periods. She had devolved into a state of insecurity over not being able to complete her educational goals, and embarred to have been forced to disclose very personal events of being victimized. Indeed, by the first quarter of the year, Crystal had literally become afraid of Defendant Tiller.

56.    Crystal began to relive being improperly hugged, sexually harassed and exploited by Defendant Tiller. She couldn't prevent the recalling of all of the unwanted advancements he had made towards her and how offensive they were, coming from "a man

of God" and holding the important position that he did.  The events had taken their toll on Plaintiff as she became fearful and didn't want to ever be touched again by anyone.

57.    Crystal's important life goal of becoming a Chaplain had been interrupted and she was placed on a detour not of her own making, but by someone that she was expected to trust and confide in.  She faced the clear possibility of having to start over in another CPE Residency Program, but because of Defendant Tiller's conduct, her confidence had been destroyed and she had been demoralized.

58.    Prior to the end of the year 2021, Crystal had been prevented from completing her class work or taking finals for her Third CPE Unit.  The emotional distress from the myriad of events caused by Defendant Tiller, had caused her emotional issues that began to interfere with her employment, forcing her to constructively discharge herself, resign and move away from Oklahoma.

59.    She had lost everything she had dreamed of, including hundreds of clinical and educational hours and CPE Units towards her Chaplaincy.  She was forced to withdraw from The University of Oklahoma Chaplaincy Residency program, and during the course of events there, her dignity had been materially damaged.

60.     Upon information and belief, Defendant Tiller has previously been involved in unwelcomed sexual advances with other students, had complaints of sexual harassment and bias, and had several complaints about his racial bigotry. Those incidents are documented in records in the possession of The University of Oklahoma and other Defendants, and have been confirmed by current staff and former students under the tutelage of Defendant Tiller, including Estela Reza.

61.    On or about February 4, 2021, Plaintiff filed a formal complaint against Defendant Tiller with the Association for Clinical Pastoral Education (ACPE), a governing association of which the University of Oklahoma is a member.  A copy of her complaint is attached hereto and incorporated by reference as Plt. Exb. No. 3.

62.    Following her initial complaint, the ACPE undertook its investigation of the events surrounding the matters raised by Plaintiff. The investigation covered a period of approximately nine (9) months.  On November 15, 2021, the ACPE investigators submitted a final report.  The observations of the Investigators concluded that Plaintiff had been hurt and traumatized by the events they investigated, that Defendant Tiller was seemingly oblivious to the seriousness of the events and charges against him, and that Tiller failed to empathize with Plaintiff's circumstances or experiences that he had created by his conduct and misbehavior. A copy of the Investigators' Report is attached hereto as Plt. Exb. No. 4.

63.    On February 21, 2022, a Fact Finding/Hearing Panel was convened to consider the ACPE/APC Ethics Complaint that Plaintiff had filed against Defendant Tiller. After full deliberations and considering all the evidence, the Panel made the decision that that Tiller had violated three (3) ethics codes, including prohibitions against:

(i)    discrimination based on race, gender, gender expression, age, religious/spiritual tradition, national origin, sexual orientation, or disability;

(ii)    respecting the integrity and welfare of those served or supervised, and refraining from disparagement and emotional exploitation, and sexual exploitation, or any other kind of exploitation;

(iii)    Failing to approach the religious convictions of a person, group, and/or CPE

student with respect and sensitivity.

64.    As a result of the Panel's decision of several violations, the Panel voted to

sanction Defendant Tiller with suspension.   A copy of the ACPE/APC Ethics Panel

Minutes & Deliberation Summary is attached hereto and incorporated by reference as Plt.

Exb. No. 5.

65.    Apparently, OUMI, The University of Oklahoma, or any other of the

Defendants, failed to conduct an independent internal investigation of Defendant Tiller.

66.    On or about March 25, 2021, Plaintiff made the initial contact with the Equal

Employment Opportunity Commission (EEOC) regarding her claims against the

Defendants.  Her charge of discrimination was filed on November 18, 2021. A true and

correct copy the Charge of Discrimination is attached hereto and incorporated by reference

as Plt. Exb. No.6.

67.    On April 27, 2022, the EEOC issued its Determination and Notice of Right

To Sue. Plaintiff, having exhausted her administrative remedies, brings all appropriate

actions within the statutory time period. A true and correct copy of Plaintiff's Right To Sue

Letter is attached hereto and incorporated by reference as Plt. Exb. No. 7.

68.    On information and belief, Defendant Tiller was finally terminated by the

University of Oklahoma on or about May 5, 2022.

69.    For the entire period of his long tenure with The University of Oklahoma, up

through his termination, The University of Oklahoma, OUMI and UHA had remained

deliberately indifferent to the allegations of Defendant Tiller's racial animas, sexual

aggression and other behaviors, even though the allegations were severe, widely known, and likely factual.

70.     Indeed, Defendants tolerance for Defendant Tiller's conduct and behavior was not only deliberately indifferent to the concerns of Plaintiff and other students and staff, but created a safe zone for his various abuses, including sexual misconduct, racist proclamations, and overall abhorrent behavior.

71.     Had the Defendants properly addressed Defendant Tiller's repulsive conduct and behavior, Plaintiff would not have been the victim to the life-changing events that are the subject matter of this lawsuit.

72.     The many years of The University of Oklahoma's deliberate indifference towards Defendant Tiller's misconduct is clearly unreasonable.

73.     It is also clearly unreasonable that even after Plaintiff alerted the University of Oklahoma of Defendant Tiller's conduct towards her, he was allowed to remain employed at the school for over a year.

## FIRST CLAIM FOR RELIEF
(Against The University Of Oklahoma, OU Medicine, Inc. and UHA)
[Deliberate Indifference Resulting in Sexual Harassment
(Strict Liability, Quid Pro Quo) in Violation of Title IX]

74.     Plaintiff re-alleges each and every prior paragraph of the Complaint as if fully set out here and further alleges as follows.

75.     At all relevant times, Defendants The University of Oklahoma and/or its affiliate, OU Medicine, Inc., directly or indirectly receives federal funding and assistance.

76.     From time-to-time, UHA enters into cooperative agreements with the Board

20

of Regents of the University of Oklahoma for educational programs, professional staffing, research and other medical activities funded by the United States of America. In that connection, UHA promulgates, implements, and possesses responsibility for policies of The University of Oklahoma and OUMI such that UHA is subject to liability imposed upon The University of Oklahoma and OUMI for acts alleged in this Complaint.

77.     Crystal was subjected to sexual harassment and unwanted sexual contact that was so severe, pervasive, and/or objectively offensive that it deprived her of access to educational opportunities and benefits.

78.     The U.S. Department of Education Office for Civil Rights has established criteria to determine if a school or university that receives public funds is strictly liable for allowing quid pro quo sexual harassment. Their guidelines state:

a.      "Schools are responsible for taking prompt and effective action to stop the harassment and prevent its recurrence."

b.      "If an employee who is acting (or who reasonably appears to be acting) in the context of carrying out these responsibilities over students engages in sexual harassment – generally this means harassment that is carried out during an employee's performance of his or her responsibilities in relation to students, including teaching, counseling, supervising, advising, and transporting students –and the harassment denies or limits a student's ability to participate in or benefit from a school program on the basis of sex, the recipient is responsible for the discriminatory conduct."

c.  "If an employee conditions the provision of an aid, benefit, or service that the employee is responsible for providing on a student's submission to sexual conduct, i.e., conduct traditionally referred to as quid pro quo harassment, the harassment is clearly taking place in the context of the employee's responsibilities to provide aid, benefits, or services.

d.  Sometimes harassment of a student by an employee in the school's program does not take place in the context of the employee's provision of aid, benefits, or services, but nevertheless is sufficiently serious to create a hostile educational environment. An example of this conduct might occur if a faculty member in the history department at a university, over the course of several weeks, repeatedly touches and makes sexually suggestive remarks to a graduate engineering student while waiting at a stop for the university shuttle bus, riding on the bus, and upon exiting the bus. As a result, the student stops using the campus shuttle and walks the very long distances between her classes. In this case, the school is not directly responsible for the harassing conduct because it did not occur in the context of the employee's responsibilities for the provision of aid, benefits, or services to students. However, the conduct is sufficiently serious to deny or limit the student in her ability to participate in or benefit from the recipient's program. Thus, the school has a duty, upon notice of the harassment, to take prompt and effective action to stop the harassment and prevent its recurrence.

e.    If the school takes these steps, it has avoided violating Title IX. If the school

fails to take the necessary steps, however, its failure to act has allowed the

student to continue to be subjected to a hostile environment that denies or

limits the student's ability to participate in or benefit from the school's

program. The school, therefore, has engaged in its own discrimination. It then

becomes responsible, not just for stopping the conduct and preventing it from

happening again, but for remedying the effects of the harassment on the

student that could reasonably have been prevented if the school had

responded promptly and effectively.

79.    Long before February 4, 2021, The University of Oklahoma and OUMI  had

actual knowledge of sexual harassment and misconduct committed by Defendant Tiller.

80.    Long before February 4, 2021, The University of Oklahoma and OUMI had

actual knowledge of the quid pro quo risks inherent in sexual relationships between

Defendant Tiller and students.

81.    Long before February 4, 2021, The University of Oklahoma and OUMI knew

or should have known that Defendant Tiller had previous sexual relationships with students.

82.    The sexual harassment committed by Defendant Tiller against Plaintiff was

committed while he was acting as an employee of Defendant, tOUMI and in conjunction

with its services to The University of Oklahoma.

83.    Indeed, The University of Oklahoma and OUMI  had actual knowledge of

sexual harassment complaints against Defendant Tiller, as alleged by Plaintiff and other

female students.

84.     Defendants OUMI and The University of Oklahoma's response to previous reports regarding Defendant Tiller was deliberately indifferent, insofar as the response or lack thereof was clearly unreasonable in light of the known circumstances.

85.     Defendant Tiller engaged in quid pro quo sexual harassment of Plaintiff. Defendant Tiller knew or should have known that Plaintiff was extremely vulnerable to his advancements due to the student-faculty relationship, and his exclusive ability to alter and jeopardize Plaintiff's educational process if she failed to accept his advances or complain about them.

86.     The University of Oklahoma and OUMI's deliberate indifference to Defendant Tiller's  conduct, as described herein, was malicious, oppressive, or in reckless disregard of Plaintiff's rights such that punitive damages are appropriate.

87.      As a result of the foregoing allegations, Plaintiff, Crystal M. Daniels, suffered extensive damage, injury and distress for which she should be compensated in an amount in excess of Three Hundred Thousand Dollars ($300,000.00).

**SECOND CLAIM FOR RELIEF**
(Against The University Of Oklahoma, OU Medicine, Inc., UHA)
[Deliberate Indifference Resulting in Sexual Harassment]
(Unwanted Sexual Contact in Violation of Title IX)

88.     Plaintiff re-alleges each and every prior paragraph of the Complaint as if fully set out here and further alleges as follows.

89.     At all relevant times, The University of Oklahoma, OU Medicine, Inc. and UHA received federal funding and assistance.

90.     From time-to-time, UHA enters into cooperative agreements with the Board

of Regents of The University of Oklahoma for educational programs, professional staffing, research and other medical activities funded by the United States of America. In that connection, UHA promulgates, implements, and possesses responsibility for policies of The University of Oklahoma and OUMI such that UHA is subject to liability imposed upon The University of Oklahoma and OUMI for acts alleged in this Complaint.

91.     Plaintiff was subjected to sexual contact that was so severe, pervasive, and/or objectively offensive that it deprived her of access to educational opportunities and benefits.

92.     The physical contact committed by Defendant Tiller was committed while he was a professor and an employee of The University of Oklahoma and OUMI.

93.     Defendant Tiller has engaged in a pattern of exploiting females who are subordinate to Defendant Tiller by virtue of their student status or their junior employment status.

94.     The University of Oklahoma had previously received several complaints from students that revealed substantiated instances where Defendant Tiller engaged in the same or similar forms of discrimination and misconduct as complained of here by Plaintiff.

95.     The physical contact that Defendant Tiller made with Plaintiff was intentional contact and included unwelcomed hugging of a sexual nature, and acts indicating unwelcomed apprehension of sexual contact, in which Plaintiff sensed Defendant Tiller's erect penis against her.

96.     Given the extent of this physical touching, the proximity and locations on Plaintiff body touched by Defendant Tiller, and the manner of the touching by Defendant Tiller, it was sexual in nature.

97.     Plaintiff did not consent to Defendant Tiller's touching her in a sexual manner.

98.     Defendant Tiller was in a direct supervisory and evaluative role over Plaintiff for all material times regarding the claims alleged.

99.     Defendant Tiller was the instructor of record for the overall course, evaluation, one-on-one personal sessions and had the authority to submit final grades for Plaintiff.

100.     Defendant Tiller engaged in multiple instances of non-consensual sexual contact with Plaintiff.

101.     On information and belief, the non-consensual physical contact violated applicable school policies of The University of Oklahoma and OUMI.

102.     The University of Oklahoma and OUMI's response to previous reports regarding Defendant Tiller's conduct was deliberately indifferent, insofar as the response or lack thereof was clearly unreasonable in light of the known circumstances.

103.     Prior to February 4, 2021, The University of Oklahoma and OUMI had notice of sexual misconduct within the Department of Clinical Pastoral Education.

104.     Prior to February 4, 2021, The University of Oklahoma and OUMI  had notice of allegations of prior sexual misconduct between Defendant Tiller and students.

105.     The standard for deliberate indifference in matters of sexual harassment has been recognized by prior case law in this circuit, including *Sh. A., ex rel. J.A. v. Tucumcari Mun. Schools,* 321 F.3d 1285, 1288 (10th Cir. 2003) and  *Johnson v. Martin*, 195 F.3d 1208, 1216 (10th  Cir. 1999).

106.    Prior to February 4, 2021, The University of Oklahoma and OUMI was deliberately indifferent to sexual misconduct within the Department of Clinical Pastoral Education and its deliberate indifference was clearly unreasonable.

107.    The University of Oklahoma and OUMIU's conduct as described herein was malicious, oppressive, or in reckless disregard of Plaintiff's rights such that punitive damages are appropriate.

108.    As a result of the foregoing, Plaintiff has suffered extensive damages which entitle her to monetary relief in excess of Three Hundred Thousand Dollars ($300,000.00).

**THIRD CLAIM FOR RELIEF**
(Against The University Of Oklahoma, OU Medicine, Inc., UHA)
[Deliberate Indifference Resulting in Sexual Harassment]
(Quid Pro Quo in Violation of Title IX)

109.    Plaintiff re-alleges all prior paragraphs of the Complaint as if set out here in full.

110.    At all relevant times, The University of Oklahoma and OUMI received federal funding and assistance.

111.    From time-to-time, UHA enters into cooperative agreements with the Board of Regents of the University of Oklahoma for educational programs, professional staffing, research and other medical activities funded by the United States of America. In that connection, UHA promulgates, implements, and possesses responsibility for policies of The University of Oklahoma and OUMI such that UHA is subject to liability imposed upon The University of Oklahoma and OUMI for acts alleged in this Complaint.

112.    Plaintiff was subjected to sexual harassment and unwanted sexual contact

that was so severe, pervasive, and/or objectively offensive that it deprived her of access to educational opportunities and benefits.

113.    Before February 4, 2021, The University of Oklahoma and OUMI had actual knowledge of sexual harassment and misconduct committed by Defendant Tiller.

114.    Before February 4, 2021, The University of Oklahoma and OUMI had actual knowledge of the quid pro quo risks inherent in sexual relationships between faculty and students.

115.    Before February 4, 2021, The University of Oklahoma and OUMI knew or should have known that Defendant Tiller had engaged in previous sexual harassment and relationships with students.

116.    The sexual harassment committed by Defendant Tiller against Plaintiff was committed while he was acting as an employee of, or under contract with The University of Oklahoma and OUMI, and after the Defendants had actual knowledge of sexual harassment complaints against Defendant Tiller.

117.    The University of Oklahoma and OUMI's response to previous reports regarding Defendant Tiller's conduct was deliberately indifferent, insofar as the response or lack thereof was clearly unreasonable in light of the known circumstances.

118.    Defendant Tiller engaged in quid pro quo sexual harassment of Plaintiff and Defendant Tiller was well aware of the circumstances of the parties' relationship at the time of the harassment.

119.    Defendant Tiller's harassment of Plaintiff included physical, verbal or demonstrative conduct of a sexual nature that was unwelcomed and sufficiently severe or

pervasive such that, from both a subjective and an objective viewpoint, it would appear that:

a.      Submission to the conduct was either explicitly or implicitly a term or condition of her employment or academic status;

b.      Submission to or rejection of such conduct could be used as the basis for employment or academic decisions affecting her; or

c.      Such conduct had the purpose or effect of unreasonably interfering with her work, performance, or education experience; or of creating an intimidating, hostile, or offensive environment for work or learning.

120.    At all times pertinent to Defendant Tiller's misconduct, Plaintiff was a new participant in a summer internship program, required to participate in one-on-one interviews with Defendant Tiller, take part in group class discussion supervised by Defendant Tiller, and during such periods where Defendant Tiller was in the process of assigning grades that would impact Plaintiff's completion of Units to fulfill graduation requirements.

121.    It was reasonable for Plaintiff to believe that her grade, academic status, and other academic benefits were conditioned on submitting to Defendant Tiller's touching her in a sexual nature.

122.    A reasonable person under these same circumstances could similarly believe that their grade and academic status were conditioned on submitting to Defendant Tiller's touching in a sexual nature.

123.    Defendant Tiller's conduct meets both the subjective and objective standards

of severity required to establish quid pro quo sexual harassment.

124.    The power differential described herein would be inherent in any professor/student relationship within the Department of Clinical Pastoral Education, and Defendant Tiller has for more than fifteen (15) years knowingly exploited his power differential over female students in order to carry on sexually oppressive behavior towards them.

125.    The University of Oklahoma and OUMI's deliberate indifference to Defendant Tiller's conduct as described herein was malicious, oppressive, or in reckless disregard of Plaintiff's rights such that punitive damages are appropriate.

126.    As a result of the foregoing, Plaintiff suffered extensive damages for which she is entitled to monetary compensation in excess of Three Hundred Thousand Dollars ($300,000.00).

## FOURTH CLAIM FOR RELIEF
(Against The University Of Oklahoma, OU Medicine, Inc., UHA )
[Deliberate Indifference Resulting in Hostile Environment in Violation of Title IX]

127.    Plaintiff re-alleges all prior paragraphs of the Complaint as if set out here in full.

128.    From time-to-time, UHA enters into cooperative agreements with the Board of Regents of the University of Oklahoma for educational programs, professional staffing, research and other medical activities funded by the United States of America. In that connection, UHA promulgates, implements, and possesses responsibility for policies of The University of Oklahoma and OUMI such that UHA is subject to liability imposed upon The University of Oklahoma and OUMI for acts alleged in this Complaint.

129.    The physical and verbal conduct by Defendant Tiller was of a sexual nature and was unwelcomed and sufficiently severe or pervasive from both a subjective and objective viewpoint such that the conduct had the purpose or effect of unreasonably interfering with Plaintiff's work or academic performance, or creating an intimidating, hostile, or offensive environment for working and learning.

130.    The environment created from the conduct of Defendant Tiller was hostile based on the circumstances, including but not limited to the frequency of the conduct, the nature and severity of the conduct, the relationship between the parties, the location and context in which the conduct occurred, and the physically threatening and humiliating nature of the conduct.

131.    On information and belief, the conduct by Defendant Tiller violated applicable policies of The University of Oklahoma and OUMI.

132.    The University of Oklahoma and OUMI, by and through their employees and agents, including but not limited to Defendant Tiller, had notice of the history of sexual misconduct and harassment within the department and were, prior to February 4, 2021 and after February 4, 2021, deliberately indifferent to Plaintiff's well-being.

133.    The University of Oklahoma and OUMI's response to previous reports regarding Defendant Tiller's behavior was deliberately indifferent.

134.    The University of Oklahoma and OUMI's response to known risks of Defendant Tiller's behavior prior to February 4, 2021 was clearly unreasonable in light of the known circumstances.

135.    The University of Oklahoma and OUMI's response to the events as described

in Plaintiff's complaint in February, 2021, and complaints to other staff at the University of Oklahoma, also created a hostile environment.

136.   Indeed, after Plaintiff lodged her complaint, Plaintiff was subjected to verbal abuse, humiliation and harassment within the Department of Clinical Pastoral Education that was so severe, pervasive and objectively offensive that she was denied access to educational opportunities and benefits.  Moreover, Plaintiff's fear of not being permitted to complete her education, after the incidents and making of her complaint, were borne out by acts and conduct of Defendant Tiller which apparently were sanctioned by The University of Oklahoma and OUMI.

137.   During the course of events complained of here, Plaintiff's office was in close proximity to Defendant Tiller's office; and Plaintiff was forced to take measures to defend against the conduct of Defendant Tiller, including efforts to avoid coming in contact with him.

138.   Additionally, the almost year-long investigation that was underway regarding Defendant Tiller's behavior and conduct weighed on Plaintiff heavily; and Defendant Tiller's conduct has interfered with both Plaintiff's academic and work performance.

139.   As a result of The University of Oklahoma and OUMI's deliberate indifference, Plaintiff has lost valuable educational opportunities, had to forfeit the Units of CPE accumulated, and otherwise has lost educational opportunities and other benefits.

140.   This conduct described herein constitutes multiple instances of a hostile environment in violation of Title IX.

141.    The University of Oklahoma and OUMI's deliberate indifference to Defendant Tiller's conduct as described herein was malicious, oppressive, or in reckless disregard of Plaintiff's rights such that punitive damages are appropriate.

142.    As a result of the foregoing, Plaintiff  suffered extensive damages for which she is entitled to monetary compensation in excess of Three Hundred Thousand Dollars ($300,000.00).

**FIFTH CLAIM FOR RELIEF**
(Against The University Of Oklahoma, OU Medicine, Inc., UHA)
[Deliberate Indifference Resulting in Sexual Harassment]

143.    Plaintiff  re-alleges all prior paragraphs of the Complaint as if set out here in full.

144.    From time-to-time, UHA enters into cooperative agreements with the Board of Regents of the University of Oklahoma for educational programs, professional staffing, research and other medical activities funded by the United States of America. In that connection, UHA promulgates, implements, and possesses responsibility for policies of The University of Oklahoma and OUMI such that UHA is subject to liability imposed upon The University of Oklahoma and OUMI for acts alleged in this Complaint.

145.    The sex-based harassment described in the Plaintiff's General Allegations was so severe, pervasive, and objectively offensive that it deprives Plaintiff of access to educational opportunities or benefits provided by the University of Oklahoma and OUMI.

146.    Defendant The University of Oklahoma  and OUMI created and/or subjected Plaintiff to a hostile educational environment in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) ("Title IX"), because:

a.     Plaintiff was a member of a protected class;

b.     Plaintiff was subjected to sexual harassment in the form of unwanted sexual contact by a Professor;

c.     Plaintiff was subjected to harassment based on her sex; and

d.     Plaintiff was subjected to a hostile educational environment created by The University of Oklahoma and OUMIU's lack of policies and procedures, and failure to properly investigate and/or address the unwanted sexual contact and subsequent harassment.

147.   Defendant The University of Oklahoma, OUMI and their officials had received actual notice of Defendant Tiller's misconduct on other occasions, as reported by students enrolled in CPE courses in which Defendant Tiller was the professor, yet failed to investigate and discipline Defendant Tiller in a timely and consistent manner within its own policies, and federal and state law.

148.   The University of Oklahoma and OUMI's failure to promptly and appropriately respond to the actual notice of sexual harassment and misconduct by Defendant Tiller, resulted in Plaintiff being denied her educational opportunities and benefits in violation of Title IX, on the basis of her sex.

149.   The University of Oklahoma and OUMI failed to take immediate, effective, and remedial steps to investigate and respond to the notice it received of Defendant Tiller's prior sexual harassment, and instead acted with deliberate indifference towards those complaints and towards Plaintiff.

150.   The University of Oklahoma and OUMI engaged in a pattern and practice of

behavior designed to avoid taking responsibility for, and responding to Defendant Tiller's known sexual misconduct.

151.    The University of Oklahoma and OUMI knew that Defendant Tiller was unfit to teach at The University of Oklahoma because he consistently sexually harassed members of the student body, including Plaintiff.

152.    The University of Oklahoma and OUMI's deliberate indifference was clearly unreasonable and its policies and/or practices constituted disparate treatment of females and had a disparate impact on female students, including Plaintiff.

153.    Plaintiff has suffered emotional distress and psychological damage and other damages, and her character and standing in her community and education have suffered from the harassment fostered as a direct and proximate result of The University of Oklahoma and OUMI's deliberate indifference to her rights under Title IX.

154.    The University of Oklahoma's deliberate indifference to Defendant Tiller's conduct, as described herein, was malicious, oppressive, or in reckless disregard of Plaintiff's rights such that punitive damages are appropriate.

155.    As a result of the foregoing, Plaintiff suffered extensive damages for which she is entitled to monetary compensation in excess of Three Hundred Thousand Dollars ($300,000.00).

### SIXTH CLAIM FOR RELIEF
(Against The University Of Oklahoma and OU Medicine, Inc., UHA)
[Deliberate Indifference Resulting A Racially Hostile Educational Environment]
(In Violation of Title VI)

156.    Plaintiff re-alleges each and every prior paragraph of the Complaint as if fully

set out here and further alleges as follows.

157.    At all relevant times, The University of Oklahoma, OU Medicine, Inc., and UHA received federal funding and assistance.

158.    From time-to-time, UHA enters into cooperative agreements with the Board of Regents of the University of Oklahoma for educational programs, professional staffing, research and other medical activities funded by the United States of America. In that connection, UHA promulgates, implements, and possesses responsibility for policies of The University of Oklahoma and OUMI such that UHA is subject to liability imposed upon The University of Oklahoma and OUMI for acts alleged in this Complaint.

159.    Plaintiff was one of the intended beneficiaries of the federal funds provided to the those Defendants.

160.    Plaintiff was subjected to a racially hostile educational environment prior to February 4, 2021, that was so severe, pervasive, and/or objectively offensive that it deprived her of access to educational opportunities and benefits.

161.    The racially hostile educational environment was fueled, open, and promoted by Defendant Tiller while he was a professor and an employee, contractor or agent of The University of Oklahoma and OUMI.

162.    Defendant Tiller has engaged in a pattern of making racially explicit statements about African Americans, demeaning African Americans, and freely exhibiting his bigoted views of African Americans, both directly to Plaintiff and to his students as well.

163.   The University of Oklahoma and OUMI had previously received several complaints from students that revealed substantiated instances where Defendant Tiller engaged in the racially charged animus towards African Americans, or similar forms of racial discrimination and misconduct as complained of here by Plaintiff.

164.   Given that Defendant Tiller openly expressed his racial views, exhorted racial inferiority of African Americans in the classroom, and freely displayed his racially charged views, there was no doubt as to his intent or the nature of his racial animus.

165.   On several occasions while Plaintiff was in one-on-one sessions with Defendant Tiller, she was directly subjected to the hostile racial environment perpetuated by Defendant Tiller.

166.   The racial prejudice and stereotyping by Defendant Tiller have operated to deprive Plaintiff of the educational benefits to which she would be entitled and which she would be expected to receive in an environment free from racial animus.

167.   On information and belief, the racially hostile educational environment in which Defendant Tiller served to foster, and the University of Oklahoma and OUMI's acquiescence in allowing such an environment to be maintained, violated applicable policies of these Defendants.

168.   The University of Oklahoma and OUMI's response to previous reports regarding Defendant Tiller's conduct in fostering a racially hostile educational environment was deliberately indifferent, insofar as the response or lack thereof was clearly unreasonable in light of the known circumstances.

169.   Prior to February 4, 2021, The University of Oklahoma and OUMI had notice

of the racially hostile educational environment within the Department of Clinical Pastoral Education.

170.    Prior to February 4, 2021, The University of Oklahoma and OUMI had notice of allegations of prior acts and conduct of Defendant Tiller in creating and promoting a racially hostile educational environment.

171.    The standard for deliberate indifference in matters of a racially hostile educational environment has been recognized by prior case law in this circuit. *See, Murrell v. School Dist. No. 1. Denver, Colo.*, 186 F.3d 1238 (10th Cir. 1999).

172.    Prior to February 4, 2021, the University of Oklahoma and OUMI was deliberately indifferent to the racially hostile educational environment within the Department of Clinical Pastoral Education and its deliberate indifference was clearly unreasonable.

173.    The sort of unchecked racially hostile educational environment which Defendant Tiller fostered, and The University of Oklahoma and OUMI's allowance that it festered for years, demonstrates that The University of Oklahoma and OUMI is utterly failing in its mandate to provide a nondiscriminatory educational environment.

174.    As a result of the foregoing, Plaintiff has suffered extensive damages which entitle her to monetary relief in excess of Three Hundred Thousand Dollars ($300,000.00).

<u>**SEVENTH CLAIM FOR RELIEF**</u>
(Against The University Of Oklahoma and OU Medicine, Inc.)
[Unlawful Retaliation]
(In Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.,)

175.    Plaintiff re-alleges each and every prior paragraph of the Complaint as if fully

set out here.

176.   Almost immediately after Plaintiff made out her complaints regarding the acts and conduct of Defendant Tiller in connection with his various forms of discrimination, she was subjected to various forms or retaliation by Defendant Tiller, all of which was ultimately sanctioned by The University of Oklahoma and OUMI.

177.   For example, in an initial one-on-one session with Defendant Tiller, she was confronted by him to explain and justify why she had filed her complaint.  During that session, Defendant Tiller was angry, he intentionally belittled Plaintiff, and made outrageous statements about her competency, all with the objective of venting his outrage that she'd made a complaint against him.

178.   Shortly following that session, Defendant Tiller banned Plaintiff from his class and from any future in-person interviews that Plaintiff needed to complete her CPE coursework and studies.  Indeed, it was not long after having filed her complaint against Defendant Tiller that it was obvious that The University of Oklahoma had made it impossible for her complete her Residency with OUMI or  to graduate.

179.   Such retaliation was directly related to Plaintiff having pursued her protected right of seeking a remedy from discrimination.

180.   Defendant Tiller's, and thereby, the University of Oklahoma and OUMI's retaliation against Plaintiff for seeking her protected rights, was unlawful and in violation of  Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*., as amended.

181.   The acts and conduct of Defendant Tiller, and thereby the acts and conduct of The University of Oklahoma and OUMI were intentional, willful and in reckless

disregard of Plaintiff's rights as protected by the Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*., as amended.

182.    Due to Defendant Tiller's unlawful acts and conduct,  and the failure of the University of Oklahoma and/or OUMI to intervene in order to arrest such conduct,  Plaintiff has suffered harm and thus is entitled to damages.

183.    As a result of the foregoing, Plaintiff has suffered extensive damages which entitle her to monetary relief in excess of Three Hundred Thousand Dollars ($300,000.00).

### EIGHTH CLAIM FOR RELIEF
(Against The University Of Oklahoma and OU Medicine, Inc.)
[Constructive Discharge]
(In Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.,)

184.    Plaintiff re-alleges each and every prior paragraph of the Complaint as if fully set out here.

185.    Following Defendant Tiller's decision to ban Plaintiff from participating in either his in-person classes or the required one-on-one sessions, which were necessary for Plaintiff to complete the CPE hours for the Third Unit, Plaintiff was left struggling to find a substitute Educator or other means of remaining in class.

186.    Plaintiff reached out to supervisors and other staff at the Department of Clinical Pastoral Education, but was unsuccessful at every turn.  The door appeared closed and she didn't have any key that fit the lock.

187.    Notwithstanding that she was barred from the academic side of her Pastoral Residency, Plaintiff was still obligated to the clinical side. She remained committed to those patients for whom she cared for, and wanted to continue providing the kind of relief

that she had been giving them over the past several months.

188.   Yet, the events of what had occurred since her internship, throughout her classroom setting, and the one-on-one settings with Defendant Tiller, were taking its toll on her physically, mentally and emotionally.

189.   The stress and anxiety of not knowing if she'd ever get back in class to complete her CPE, and the events concerning Defendant Tiller, collided with her own reality that she had no control over the situations that she faced.   Not only was her educational goals upended, but her life was in limbo.  These circumstances, combined with her twelve-hour shifts in providing pastoral care to patients in crisis mode, proved too much to handle. She sought medical attention in order to cope with the totality of events as they piled up.

190.   Plaintiff feared for her own well-being, and was also concerned that the environment at The University of Oklahoma and OUMI could likely cause her to make improper decisions while on the job. Her personal anxiety, and the need to be mindful of her patients called for a tough decision.

191.   Accordingly, with a sad heart and regret, on May 21, 2021, Plaintiff tendered her resignation from the OU CPE Chaplaincy Residency program, which by association, included her employment with OU Medicine, Inc.

192.   Plaintiff's constructive discharge occurred under the circumstances that gave rise to the discrimination which she had previously complained and asserted on account of membership in a protected class.

193.   Plaintiff's resignation occurred under circumstances where The University

of Oklahoma and OUMI had intentionally created, and allowed to exist, an intolerable work atmosphere that forced her resignation.

194.    As a result of the foregoing, Plaintiff has suffered extensive damages which entitle her to monetary relief in excess of Three Hundred Thousand Dollars ($300,000.00).

## NINTH CLAIM FOR RELIEF
(Against The University of Oklahoma, UHA, OUMI)
[Discrimination based on sex, race, and retaliation in violation of
42 U.S.C. §§ 1981 and 1983]

195.    Plaintiff re-alleges each and every prior paragraph of the Complaint as if fully set out here.

196.    From time-to-time, UHA enters into cooperative agreements with the Board of Regents of the University of Oklahoma for educational programs, professional staffing, research and other medical activities funded by the United States of America. In that connection, UHA promulgates, implements, and possesses responsibility for policies of The University of Oklahoma and OUMI such that UHA is subject to liability imposed upon The University of Oklahoma and OUMI for acts alleged in this Complaint.

197.    Race Discrimination and disparate treatment based on race, is a violation of 42 U.S.C §1981, pursuant to subsections (a), (b), and (c). Additionally, retaliation is prohibited under 42 U.S.C §1981. All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to

like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other. *Id.*

198.   All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other. *Id.*

199.   "Make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. *Id.*

200.   Pursuant to 42 U.S.C. § 1983, every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

201.   As a result of the foregoing, Plaintiff has suffered extensive damages which entitle her to monetary relief in excess of Three Hundred Thousand Dollars ($300,000.00).

## TENTH CLAIM FOR RELIEF
(Against Darryl Tiller In His Individual Capacity)
[Sexual Harassment in Violation of Fourteenth Amendment of the Constitution of the United States of America Pursuant to 42 U.S.C. § 1983]

202.    Plaintiff  re-alleges all prior paragraphs of the Complaint as if set out here in full.

203.    Under the Fourteenth Amendment, Plaintiff had the right as a public university student to personal security and bodily integrity and Equal Protection of Laws.

204.    Defendant Tiller sexually harassed Plaintiff  while he was a state actor, and acting in his individual capacity, under the color of state law.

205.    Defendant Tiller subjected Plaintiff to violations of her right to personal security, bodily integrity, and Equal Protection of Laws, by subjecting her to egregious sexual harassment during her summer internship with The University of Oklahoma and while engaged in acts to complete her academic service with OUMI . These violations also occurred during one-on-one interview sessions, as part and parcel of the teaching program for Clinical Pastoral Education.

206.    Defendant Tiller subjected Plaintiff to sexual harassment and unwanted sexual contact that was so severe and objectively offensive that it violated Plaintiff's constitutional rights.

207.    The physical contact that Defendant Tiller made with Plaintiff was intentional contact and included: hugging in a clearly sexual manner, such that Defendant Tiller intended to make contact with Plaintiff's breast; and was of such proximity that Plaintiff could feel Tiller's erect penis against her. Given the extent of this physical

touching, the locations on Plaintiff's body that was touched by Defendant Tiller, and the manner of the touching by Defendant Tiller, was clearly of a sexual nature.

208.    Plaintiff did not consent to Defendant Tiller's touching her in a sexual manner.

209.    Defendant Tiller was in a direct supervisory and evaluative role over Plaintiff during all material times complained of in this action.

210.    Defendant Tiller  was the instructor of record for the overall course, the one-on-one interviews, and evaluations of Plaintiff. He was also the Professor that submitted final grades for all students, including Plaintiff.

211.    Defendant Tiller engaged in multiple instances of non-consensual sexual contact with Plaintiff during the course of her summer internship and Residency at The University of Oklahoma and OUMI.

212.    Defendant Tiller's conduct constituted disparate treatment of females and had a disparate impact on female students. Defendant Tiller was known to have engaged the harassment of at least two other female students, prior to the incidents complained of here by Plaintiff.

213.    Plaintiff has had her academic life and standing disrupted, and has personally suffered emotional and psychological distress, all as a direct and proximate result of Defendant Tiller's sexual harassment.

214.    Defendant Tiller's conduct, as described herein, violated Plaintiff's clearly established constitutional rights of which a reasonable person would have known.

215.   Defendant Tiller's conduct, as described herein, was malicious, oppressive, or in reckless disregard of Plaintiff's rights such that punitive damages are appropriate.

216.   As a result of the foregoing, Plaintiff suffered extensive damages for which monetary compensation is due in excess of Three Hundred Thousand Dollars ($300.000.00).

## ELEVENTH CLAIM FOR RELIEF
(Against Darryl Tiller In His Individual Capacity)
[Sexual Harassment (Quid Pro Quo) in Violation of Fourteenth Amendment of the Constitution of the United States of America Pursuant to 42 U.S.C. § 1983]

217.   Plaintiff re-alleges all prior paragraphs of the Complaint as if set out here in full.

218.   Under the Fourteenth Amendment, Plaintiff had the right as a public university student to personal security, bodily integrity, and Equal Protection of Laws.

219.   Defendant Tiller sexually harassed Plaintiff while he was a state actor acting in his individual capacity, under the color of state law.

220.   Defendant Tiller subjected Plaintiff to sexual harassment and unwanted sexual contact that was so severe and objectively offensive that it violated Plaintiff's constitutional rights.

221.   Defendant Tiller engaged in quid pro quo sexual harassment of Plaintiff in connection with her academic studies while at The University of Oklahoma and residency with OUMI.

222.   Defendant Tiller's harassment of Plaintiff included physical or verbal conduct of a sexual nature that was unwelcomed and sufficiently severe or pervasive, such

that, from both a subjective and an objective viewpoint, it would appear that:

a.      Submission to the conduct was either explicitly or implicitly a term or condition of her employment or academic status;

b.      Submission to or rejection of such conduct could be used as the basis for employment or academic decisions affecting her; or

c.      Such conduct had the purpose or effect of unreasonably interfering with her work, performance, or education experience; or of creating an intimidating, hostile, or offensive environment for work or learning.

223.    During both the course of Plaintiff's internship and academic one-on-one interviews, Defendant Tiller's actions of insisting on repeatedly touching Plaintiff, accentuated the power differential between the parties. Defendant Tiller's conduct also demonstrates that Defendant Tiller was not afraid to exploit the power differential to pursue sexual contact with Plaintiff.

224.    From the period of Plaintiff's summer internship and through her Residency at The University of Oklahoma and OUMI, Defendant had not yet made decisions affecting Plaintiff's academic progress or assigned grades for the coursework being undertaken by Plaintiff.

225.    It was reasonable for Plaintiff to believe that her grade and academic status was conditioned on submitting to Defendant Tiller's touching her in a sexual nature.

226.    A reasonable person under these same circumstances could similarly believe that their grade and academic status was conditioned on submitting to Defendant Tiller's touching in a sexual nature.

227.    Defendant Tiller's conduct meets both the subjective and objective standards of severity required to establish quid pro quo sexual harassment.

228.    Defendant Tiller's conduct, as described herein, violated Plaintiff's clearly established constitutional rights of which a reasonable person would have known.

229.    Defendant Tiller's conduct, as described herein, was malicious, oppressive, or in reckless disregard of Plaintiff's rights such that punitive damages are appropriate.

230.    As a result of the foregoing, Plaintiff suffered extensive damages for which monetary compensation is due in excess of Three Hundred Thousand Dollars ($300,000.00).

## TWELTH CLAIM FOR RELIEF
(Against Darryl Tiller In His Individual Capacity)
[Hostile Environment in Violation of Fourteenth Amendment of the Constitution of the United States of America Pursuant to 42 U.S.C. § 1983]

231.    Plaintiff re-alleges all prior paragraphs of the Complaint as if set out here in full.

232.    Under the Fourteenth Amendment, Plaintiff had the right as a public university student to personal security, bodily integrity, and Equal Protection of Laws.

233.    Defendant Tiller sexually harassed Plaintiff while he was a state actor acting in his individual capacity, under the color of state law.

234.    Defendant Tiller subjected Plaintiff to sexual harassment and unwanted sexual contact that was so severe and objectively offensive that it violated Plaintiff constitutional rights.

235.    The physical and verbal conduct by Defendant Tiller was of a sexual nature

and was unwelcomed. His acts were also sufficiently severe or pervasive, from both a subjective and objective viewpoint, such that the conduct had the purpose or effect of unreasonably interfering with Plaintiff's work or academic performance, or creating an intimidating, hostile, or offensive environment for working, learning, or living.

236.   The physical and verbal conduct by Defendant Tiller was of a sexual nature and was unwelcomed. His acts were also sufficiently severe or pervasive, from both a subjective and objective viewpoint, such that the conduct had the purpose or effect of unreasonably interfering with Plaintiff's work or academic performance or creating an intimidating, hostile, or offensive environment for working or learning.

237.   The environment created from the conduct of Defendant Tiller was hostile, based on the circumstances, including but not limited to the frequency of the conduct, the nature and severity of the conduct, the relationship between the parties, the location and context in which the conduct occurred, and the physically threatening and humiliating nature of the conduct.

238.   The environment resulting from Defendant Tiller's conduct also constituted a hostile environment, in that:

a.   After the occurrence, Plaintiff was subjected to verbal and physical sexual harassment within the Department of Clinical Pastoral Education that was so severe, pervasive and objectively offensive that she was denied access to educational opportunities and benefits.

b.   For Plaintiff, The University of Oklahoma and OUMI became a sexually hostile environment where her harasser was still at the campus facility and teaching within

the Department of Clinical Pastoral Education.

c.     As a result to the hostile environment Plaintiff was denied educational opportunities and was forced to forfeit her investment monetarily and academically after the incidents complained of herein.

d.     Plaintiff encountered complications in the Department of Pastoral Education directly stemming from both the conduct and authority over her by Defendant Tiller.

e.     Plaintiff's  office was in close proximity to Defendant Tiller such that Plaintiff was forced to take precautions to avoid coming in contact with Defendant Tiller.

f.     The investigation which ensued weighed heavily upon Plaintiff and became a rationale for Defendant Tiller's decision to not permit Plaintiff either in -class sessions or the continuance of individual educational sessions.  All of these efforts tended to interfere with Plaintiff's academic performance.

239.   Defendant Tiller's conduct, as described herein, violated Plaintiff's clearly established constitutional rights of which a reasonable person would have known.

240.   Defendant Tiller's conduct, as described herein, was malicious, oppressive, or in reckless disregard of Plaintiff's rights such that punitive damages are appropriate.

241.   As a result of the foregoing, Plaintiff suffered extensive damages for which monetary compensation is due in excess of Three Hundred Thousand Dollars ($300,000.00).

**THIRTEENTH CLAIM FOR RELIEF**
(Against Darryl Tiller In His Individual Capacity)
[Negligence]

242.   Plaintiff re-alleges all prior paragraphs of the Complaint as if set out here.

in full.

243.    Attached as Exhibit No. 4 to Plaintiff's Complaint is the Investigators' Report of the matters involved with Plaintiff's interaction with Defendant Tiller and some of the allegations and complaints alleged herein.

244.    During the course of the investigation by the ACPE, the investigators had the opportunity to meet and interview Defendant Tiller, for purposes of obtaining information from him about the allegations, and observing both his response and behavior.

245.    The Investigators' Report found that Defendant Tiller didn't take the claims made by Plaintiff seriously and viewed the entire circumstance as being an "irritant." It further observed that Defendant Tiller "did not seem to empathize with Plaintiff's trauma experience."

246.    During the course of Plaintiff' academic and work performance at The University of Oklahoma and OUMI, and particularly with her one-on-one interview sessions with Defendant Tiller, he had a duty to exercise due care and caution for her mental and emotional safety.  That duty was perhaps more acute due to the spiritual, religious and moral nature of the party's environment and Defendant Tiller's standing.

247.    Notwithstanding the aforesaid duty, Defendant Tiller was guilty of one or more of the following negligent and/or reckless acts or omissions:

a.      Failed to exercise caution towards Plaintiff.

b.      Failed to exercise due care in his physical interactions with Plaintiff;

c.      Because of his lack of self-discipline, engaged in sexual misconduct that included, but was not limited to, unwanted touching of Plaintiff by insisting on close quarter hugging without consent;

d.      Because of his lack of self-discipline, made sexual advances and continued to make sexually charged statements to Plaintiff.

248.    As a result of one or more of the foregoing negligent acts or omissions, Plaintiff repeatedly suffered bodily harm by Defendant Tiller.

249.    As a direct and proximate result of one or more of the aforesaid negligent acts and/or omissions of Defendant Tiller, Plaintiff has had her life negatively altered, her academic life and standing disrupted, and has personally suffered emotional and psychological distress, all as a direct and proximate result of Defendant Tiller's negligence.

250.    Plaintiff has lost great gains that would have otherwise been made and acquired, will in the future lose gains she would have made and acquired, and has and continues to be impaired from going about her daily affairs, all as a result of Defendant Tiller's damage.

251.    As a result of the foregoing, Plaintiff suffered extensive damages for which monetary compensation is due in excess of Three Hundred Thousand Dollars ($300,000.00).

252.    Plaintiff  reserves the right to seek punitive damages as may be appropriate.

## FOURTEENTH CLAIM FOR RELIEF
### (Against Darryl Tiller In His Individual Capacity)
### [Intentional Infliction Of Emotional Distress]

253.    Plaintiff re-alleges all prior paragraphs of the Complaint as if set out here.

in full.

254.    As described above, Defendant Tiller's  actions were extreme and outrageous. Defendant's acts were intentional and/or reckless.

255.    Defendant Tiller's acts and conduct caused Plaintiff severe emotional distress.

256.    The acts by Defendant Tiller exceeded all bounds typically tolerated in a decent society, and caused Plaintiff serious physical, financial, emotional and mental distress and trauma.

257.    As a result of the foregoing, Plaintiff suffered extensive damages for which monetary compensation is due in excess of Three Hundred Thousand Dollars ($300,000.00).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully demands judgment against Defendants, and each of them, and seeks from the Court the following relief:

(a)    Damages in amounts to be established at trial, including, without limitation, reimbursement and prepayment for all of Plaintiff's tuition and related expenses; payment of Plaintiff's expenses incurred as a consequence of the sexual harassment; damages for deprivation of equal access to the educational benefits and opportunities provided by the University of Oklahoma; damages for past, present and future emotional pain and suffering, ongoing and severe mental anguish, loss of past, present and future enjoyment of life, past, present, and future medical expenses, and lost earnings and earning capacity;

(b)    Other Compensatory Damages;

(c)      Punitive damages as may be allowable;

(d)      Injunctive relief as this Court deems necessary and proper;

(e)      A declaratory judgment that Defendants violated Plaintiff's Constitutional rights;

(f)      That this Court Order The University of Oklahoma to provide mandatory training for all employees within the Department of Clinical Pastoral Education to include principles of respecting human and civil rights; sex abuse and sexual aggression;

(g)      That The University of be ordered to create a system of reporting sexual misconduct that is less intimidating for the most vulnerable members of the community, including students, untenured faculty, and junior faculty, and

(j)      such other and further relief as may be available in law and equity.

Respectfully submitted,


s/Kwame T. Mumina
Kwame T. Mumina, OBA# 10415
Cynthia Rowe D'Antonio, OBA# 19652
GREEN JOHNSON MUMINA & D'ANTONIO
4101 Perimeter Center
4101 Perimeter Center Drive, Suite 110
Oklahoma City, Oklahoma 73112
Telephone:   (405) 702-7228
Facsimile:   (405) 702-6898
Email:        kmumina@gjmlawyers.com
              cynthia@gjmlawyers.com

ATTORNEYS FOR PLAINTIFF


ATTORNEY LIEN CLAIMED
JURY TRIAL DEMAND